O’Connell, Acting Chief Judge,
delivered the opinion of the court:
This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner’s rejection, as unpatentable over the cited art of record, of claims 11 to 15 inclusive in appellants’ application for a patent on a method of deinking waste paper. Claim 11, which is representative of the appealed claims, reads as follows:
11. The method of deinking waste paper in cool or cold water without cooking and use of deinking chemicals, so as to reclaim a large per cent of the fiber content as clean pulp suitable for re-use in papermaking, comprising, coarsely pulping waste paper in cool or cold water, refining the resulting coarse pulp slurry by passing it at least once through a revolving disk refiner in a few seconds while maintaining the temperature of the pulp below about 112° P. so as to shatter the ink from the fibers, said refiner having closely set opposed refining surfaces having a relative speed of at least several thousand feet per minute to produce an intense refining and shattering action, subjecting an enclosed stream of the resulting slurry of refined pulp to the action of a plurality of submerged jets of wash water so as to intensely agitate the slurry stream and disperse the fibers and shattered ink particles throughout the water vehicle without dewatering and with a substantial lowering of the consistency, and then dewatering the slurry so as to separate the ink particles from the fibers.
The references relied on are:
Wurster, 807,228, Dec. 12,1905.
Hammond, 1,026,578, May 14,1912.
Moeller (British), 258,630, Sept. 24,1926.
Barley et al., 1,984,869, Dec. 18,1934.
Inglis, 2,394,182, Feb. 5,1946.
Hill et al., 2,641,164, June 9,1953.
Casey Pulp & Paper — Vol. 1, page 325; 1952.
Pulp & Paper Manufacture — Vol. 2, pages 138, 159, 167 and 180 — 1951.
*820 Appellants’ application discloses a process of removing ink from waste paper which, as described and claimed, involves four principal steps, namely: (1) Coarsely pulping the paper in cold water; (2) Fiberizing a slurry of such pulp in a revolving disk refiner at high speed and low temperature to shatter the ink particles and loosen them from the paper fibers; (3) Subjecting an enclosed stream of the resulting slurry of refined pulp to the action of submerged high velocity jets of wash water; and (4) Dewatering the washed slurry whereby the ink is finally removed. It is stated in the specification of the application that a temperature below about 112° F. and a high speed of rotation are essential in the disk refiner.
The patent to Hill discloses a method of processing fibrous pulp in which the pulp is fed centrally between two plates which are spaced a short distance apart. One of these plates is fixed while the other is given a gyratory movement and the adjacent faces of the plates are provided with projections which grip and agitate the pulp. Water in excess of that which can be retained by the pulp is supplied through openings in the upper plate and, after passing through the pulp, is drained off through openings in the lower plate. The pulp moves outwardly and is discharged at the periphery of the plates. The plates are shaped so that they are more closely spaced at the periphery than at the center and the pulp is thus compressed as it moves outwardly. After leaving the plates the pulp is collected in a trough and then removed from the machine.
The patent to Hill suggests several ways in which the apparatus just described may be used in the deinking of paper, either with or without the use of chemicals. In such deinking the paper may be “partially disintegrated,” as by hammer milling, or may be “essentially repulped” by means, such as a disk refiner, after which it is fed to the previously described apparatus, where it is “completely repulped to individual fibres” and the ink particles are “freed from the fibres.”
The British patent to Moeller discloses a deinking process in which wet paper pulp is coarsely disintegrated by tearing and is then passed along an agitating and washing conveyor, after which it is gi’ound in one or more rotary cylindrical grinders and again agitated and washed. The initial tearing may be done in any suitable device, the preferred procedure comprising reciprocating plates provided with spikes. The washers are in the form of cylindrical rotary screens through which the pulp passes axially while it is agitated and water is sprayed on it.
The patents to Wurster and Farley were cited to show that it is old to use disk refiners for disintegrating paper pulp. Farley also suggests the operation of such a refiner at a speed comparable to that called for by the appealed claims.
*821 The remaining references were held by the board to be merely cumulative and were not discussed in detail. They are clearly no more pertinent than the references above discussed and accordingly need not be further considered here.
The appealed claims were rejected on either Hill or Moeller, considered alone, or in conjunction with Wurster or Farley. The two latter patents, as above noted, were merely cited to show that disk refiners of the kind referred to in the claims are old and, since that does not appear to be disputed, the respective grounds of rejection are essentially the same with, or without, the secondary references.
Each of the claims recites the four principal steps referred to above in the description of appellants’ invention, and it is evident that all the claims must stand or fall together. Accordingly, they will not be discussed individually.
In holding the claims unpatentable over Hill the board pointed out that the patent to Hill teaches that the pulp may be subjected to the action of a disk refiner before being acted on by the gyrating plate device which forms the principal feature defined by Hill. The board was of the opinion that the introduction of wash water into the latter device would necessarily lower the consistency of the pulp slurry and would produce a washing action comparable to that called for by the appealed claims. No specific reference was made by the board to the coarse pulping step which is recited in each of these claims. With respect to the dewatering step, the board stated that the slurry of Hill “is ultimately dewatered just as appellants’ slurry is finally dewatered.”
Notwithstanding the similarities noted by the board, there appear to be several material distinctions between the disclosure of the Hill process, and that defined by the appellants’ claims. In the first place, Hill does not suggest coarse pulping of the paper before subjecting it to the action of the disk refiner. Coarse pulping by a hammer mill is suggested as an alternative to the disk refining and not as preliminary to it. This preliminary coarse pulping is important, in that it apparently enables the disk refiner to shatter off the ink particles or loosen them from the pulp, whereas in the Hill process, where there is no preliminary coarse pulping, the disk refiner is relied on only to pulp the paper, while the gyrating plate is relied on to effect the separation of the ink from the pulp.
Moreover, we are unable to agree with the board that the patent to Hill discloses -anything reasonably corresponding to appellants’ claimed step of “subjecting an enclosed stream of the resulting slurry of refined pulp to the action of a plurality of submerged jets of wash water.” Merely feeding what the patent refers to as “a slow flow of *822 water” through, the pulp while it is being compressed between the plates of the patent does not fairly answer to the language just quoted. The flat sheet of pulp undergoing compression cannot properly be called an “enclosed stream”; nor would the openings in the upper plate through which the water enters the slurry ordinarily be thought of as providing “submerged jets of wash water.” The word “jet” implies a rapid flow as distinguished from the slow flow described by the patent. Furthermore, the consistency of the pulp is increased by the compression, whereas the appealed claims call for a substantial lowering of consistency during washing.
It is to be noted also that the claims call for the dewatering of the slurry as a separate step, following the washing, whereas in Hill, as interpreted by the board, those steps take place simultaneously while the pulp is being compressed between the perforated plates.
In addition to the foregoing, the particular temperature and speed of the disk refiner, which are set forth in the appealed claims and are said in appellants’ application to be critical, or at least important, are nowise disclosed by Hill.
Similarly, there are substantial differences between the process of the Moeller patent and that claimed by appellants. Moeller employs coarse pulping, grinding and washing which correspond generally to appellants’ first three steps. However, the grinding is done in a cylindrical disintegrator, which differs materially from a disk refiner, and the patent is silent as to speed and temperature conditions. Also, the washing is carried out in a manner entirely distinct from the enclosed stream and submerged jets called for by the appealed claims. While Moeller’s description of his washer is somewhat vague, it consists primarily of a cylindrical screen through which the pulp moves axially while it is agitated and sprayed with water. There is no enclosed stream defined by Moeller and no submerged jets. Finally, appellants’ fourth claimed step of dewatering the washed slurry so as to separate the ink particles from the fibers is not disclosed by Moeller.
There are of record affidavits filed in connection with a petition to make appellants’ application special in the Patent Office. Those affidavits show that the claimed process herein has been extensively tested with satisfactory results, and that, if a patent is granted, appellants’ assignee is prepared to build a plant for carrying out the process on a large scale. ;
On the other hand, the record contains a copy of a letter by A.E. Johnson, Sales Manager of the Ourlator Corporation which, as stated by the examiner, is the assignee of the patent to Hill. The Curlator corresponds closely to the disclosure of that patent and Johnson’s *823 letter states tbat its use is not recommended for deinking. As properly noted by the examiner and tbe board, this letter does not establish that the process defined by Hill is inoperative for deinking, but it does afford a clear indication that no commercial use of the process for that purpose has been made.
Similarly, there is of record an affidavit by appellant, Bureau, to the effect that he made an investigation but was unable to discover that the Moeller process had ever been used commercially.
Taken as a whole, the record presented here justifies the conclusion that no process of deinking at low temperatures, without the use of chemicals, has enjoyed substantial commercial success, despite the obvious desirability of using a process of that type; that appellants’ process has been sufficiently tested to give reasonable assurance of its commercial success; and that funds are available to launch it commercially if a patent is granted. These circumstances alone do not, of course, establish the presence of invention, but they are factors which are pertinent to consider.
While the claimed process is generally similar in some respects to those of Hill and Moeller, there are, as hereinbefore noted, a number of substantial differences. It may be that no such single difference defines a matter of patentable invention but, taken together, they coact with each other to produce a unitary process which has given superior results, at least in some definite respects, over the processes of the references. The claims have been carefully drawn to limit them to the particular combination of steps which produce the improved result and, in our opinion, and in view of the circumstances enumerated above, there is at least a doubt as to whether the rejections of record are proper.
Such doubts under the authorities are to be resolved in favor of the applicants. In re Pappas et al., 38 C.C.P.A. 746, 185 F. 2d 695, 88 USPQ 108; In re Hummer, 44 C.C.P.A. 814, 241 F. 2d 742, 113 USPQ 66.
The decision of the Board of Appeals is reversed.