William P. TAVOULAREAS, et al., Plaintiffs,

v.

Philip PIRO, Defendant.

William P. TAVOULAREAS, et al., Plaintiffs,

v.

The WASHINGTON POST CO., et al., Defendants.

Civ. A. Nos. 80–2387, 80–3032.

United States District Court, District of Columbia.

Sept. 10, 1981.

See also, D.C. 93 F.R.D. 35; 93 F.R.D. 24.

John J. Walsh and Jerry Birenz, New York City, and Joseph A. Artabane, Washington, D.C., for plaintiffs.

David E. Kendall and Robert C. Post, Washington, D.C., for defendant, Washington Post.

Stanley M. Brand, Gen. Counsel, and Steven R. Ross, Asst. Counsel, to the Clerk, U.S. House of Representatives, Washington, D.C., for Congressional Deponents.

Joel M. Wolosky, New York City, for defendant Comnas.

David Machanic, Washington, D.C., for defendant Piro.

### MEMORANDUM

GASCH, District Judge.

These consolidated cases are before the Court on the following motions: (1) the Post defendants' motion for a jury trial; (2) defendant Katharine Graham's motion for summary judgment; (3) the Post defendants' motion to compel answers to interrogatories; (4) plaintiffs' motion to compel the Post reporters to reveal their sources; (5) the Congressional deponents' motion to quash a subpoena; (6) the motion of George Comnas to quash a subpoena; and (7) the Congressional deponents' motion for a protective order pertaining to the deposition of Comnas.[1]

### I. BACKGROUND.

The complaints allege that on or about November 30 and December 1, 1979, *The Washington Post* published two articles about certain business transactions involving plaintiff William Tavoulareas, president of Mobil Oil Corp., and his son, plaintiff Peter Tavoulareas. The articles were prepared by defendants Patrick Tyler, a *Post* reporter, and Sandy Golden, a special correspondent for the *Post*. Simply stated, the complaint alleges that those articles suggested that plaintiff William Tavoulareas used his position in Mobil Oil to set up his son, plaintiff Peter, as a partner in a London based shipping firm, Atlas Maritime Company (Atlas), and further to assure the success of that venture. The complaint further alleges that the suggestion is false and was published by defendants either knowing it was false or in reckless disregard of its truth or falsity.

Defendant Philip Piro is the former son-in-law of plaintiff William Tavoulareas. The complaint in 80–2387 alleges that defendant Piro made statements, similar to those reported in the *Post*, to representatives of the Subcommittee on Energy and Power of the House of Representatives, representatives of the Securities and Exchange Commission and representatives of the *Washington Post*. The complaint alleges that Piro knew the statements were false or made them in reckless disregard of their truth or falsity.

1. The Congressional deponents' motion to intervene for purposes of making this motion with respect to the Comnas deposition was granted from the bench at the hearing on Friday, July 24, 1981.

George Comnas [2] was an officer of Atlas during the early period of Peter Tavoulareas' partnership in that venture. Comnas, like Piro, allegedly made statements, similar to those previously described, to the House Subcommittee, the SEC and the *Post.*

The complaint finally alleges that as a result of these false and defamatory statements plaintiffs "(1) have been held up to public disgrace, scorn and ridicule, (2) have been seriously injured in their business, and will be further seriously injured in their businesses in the future, (3) have suffered grave and permanent impairment of their reputations and standing with their friends, associates, and the general public and (4) have otherwise been injured in their good names, fame, reputation and credit." Plaintiffs seek compensatory damages in the amount of $10,000,000.00 from defendant Piro and $40,000,000.00 from the *Post* defendants. They seek exemplary damages of $10,000,000.00 from Piro and the *Post* defendants.[3]

## II. DISCUSSION.

### A. *Post Defendants' Motion for a Jury Trial.*

■ The complaint against the *Post* defendants was filed on November 25, 1980. The plaintiffs did not demand a jury trial. On December 15, the defendants answered. Because neither party made a timely demand for a trial by jury prior to the expiration of ten days after the answer, the parties waived the right to a jury trial under Fed.R.Civ.P. 38. On February 17, 1981, the *Post* defendants filed a motion for a jury trial under Rule 39(b). The rule provides in

pertinent part: "notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues." *Id.*

The question of whether a party should be allowed a jury trial notwithstanding his failure to make a timely demand under Rule 38 is one committed to the discretion of the trial court. *See* 5 Moore's Federal Practice ¶ 39.09 (cases cited at n.1). In seeking to invoke the Court's discretion under Rule 39, the *Post* defendants assert that their failure to make a timely jury demand resulted from the press of other business during the holiday season. In essence, with candor, counsel to the *Post* defendants state that they failed to make a jury demand through sheer oversight.

Professor Moore states that "it is settled today that the mere statement of 'oversight' or 'inadvertence' does not suffice to invoke the discretion of the court." 5 Moore's Federal Practice ¶ 39.09 at p. 39–30.[4] A review of the cases, however, reveals that the only place where this rule can be stated with that kind of certainty is in the Second Circuit. *See, e.g., Galella v. Onassis,* 487 F.2d 986, 997 (2d Cir. 1973). In a recent case, the United States Court of Appeals for the Fifth Circuit has stated that "[a]lthough a judge is not required to allow an untimely request for a jury trial . . . 'when the discretion of the court is invoked . . . the court should grant a jury trial in the absence of strong and compelling reasons to the contrary.' " *Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138, 144 (5th Cir. 1979) (*quoting Swofford v. B & W, Inc.,* 336 F.2d 406, 409 (5th Cir. 1964), *cert. de-*

---

2. George Comnas is named as the defendant in a third complaint pending before the Court, No. 80–2841. As a result of a stipulation extending the time within which defendant may respond to that complaint until after resolution of a dispositive motion in a nearly identical action in the United States District Court for the Southern District of New York, issue has not yet been joined in that action and it has not been consolidated with these cases.

3. The complaint against Comnas also seeks compensatory and exemplary damages in the amount of $10,000,000.00 each.

4. The rule as stated perhaps proves too much. It would seem that definitionally a party's failure to demand a jury trial is either inadvertent or intentional. There would of course seem to be less reason to relieve a party from an intentional waiver of the right to trial by jury than from an inadvertent waiver.

*nied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965)) (citations omitted) (second ellipsis in original). The few cases that have arisen in this jurisdiction on this issue presented facts far too dissimilar to be of any guidance. *See May v. Melvin,* 141 F.2d 22 (D.C.Cir.1944); *Railex Corp. v. Guss & Sons, Inc.,* 40 F.R.D. 119 (D.D.C.1966), *aff'd,* 382 F.2d 179 (D.C.Cir.1967); *Wilson & Co. v. Ward,* 1 F.R.D. 691 (D.D.C.1941). In any event, if the Court's discretion is to be exercised meaningfully in this case, all of the factors should be considered and considering those factors the Court has concluded that the *Post* defendants' motion should be granted.

First, it is apparent that the grant of this motion will not delay this action or prejudice the rights of other parties. This case has not yet proceeded to the point where there would be any apparent differences in counsel's preparation were it to be tried to a jury rather than the Court. Second, it is the Court's view that the issues which will be presented in this action are quite appropriate for jury resolution.[5] The questions of whether the individual defendants exercised appropriate care in verifying facts and the extent to which the reputations of the plaintiffs have been damaged by the stories are questions which appropriately lend themselves to resolution by the collective judgment of six individuals with appropriate guidance from and within limits imposed by the Court. Accordingly, the motion will be granted and the consolidated cases will proceed as jury actions.[6]

B. *Katharine Graham's Motion for Summary Judgment.*

The Court has concluded that defendant Graham's motion for summary judgment should be granted.

Katharine Graham is the Chairman of the Board and Chief Executive Officer of the Washington Post Co., a Delaware corporation with its principal place of business in the District of Columbia, which, among a number of other activities, publishes *The Washington Post.* In that position, Mrs. Graham is far removed from the day to day operations of the *Post.* General responsibility for the operation of the paper rests with its publisher, Donald E. Graham. Despite the allegation in the complaint, Mrs. Graham did not occupy that position in November and December of 1979 when these articles were published. Graham Aff. ¶¶ 5 & 7. Day to day operations of the *Post* are the responsibility of its Executive Editor, Ben Bradlee. Bradlee Aff. ¶ 7. Mrs. Graham indicates that she has never suggested that her personal views on energy companies should influence editorial policies at the *Post.* Graham Aff. ¶ 9. These assertions are corroborated by the affidavits of Bradlee; Bob Woodward, Managing Editor for Metropolitan News; and the two reporters, Tyler and Golden.

Plaintiff has not indicated any specific facts which would support the conclusion that Mrs. Graham participated in any form in the preparation or publication of the articles which are the bases of this action. Since some responsible participation is clearly a prerequisite to any potential liability on the part of Mrs. Graham, *see, e.g., Industrial Equip. Co. v. Emerson Elec. Co.,* 554 F.2d 276, 289 (6th Cir. 1977); *Skeoch v. Ottley,* 377 F.2d 804, 808 (3d Cir. 1967); *Lewis v. Time, Inc.,* 83 F.R.D. 455, 463 (E.D.Cal.1979), her motion for summary judgment will be granted.[7]

---

5. This is not to say as defendants appear to suggest that the motion should be granted because the action is one at law in which a jury trial has traditionally been provided as of right. This argument would go too far since a necessary prerequisite to any jury trial, whether by demand or by motion, is that the action be one in which the right is afforded.

6. The Court shares plaintiffs' concern that granting a jury trial in the case against the *Post*

defendants and not in the case against defendant Piro will defeat the purpose of consolidation of these cases. The Court feels, however, that the more appropriate response to this problem is to present both cases to the jury.

7. Plaintiff suggests that summary judgment is inappropriate where a defendant's state of mind is in issue. The suggestion places the cart well ahead of the horse. It requires no citation to authority to state that animosity

C. *Plaintiff's Motion to Compel Defendants Tyler and Golden to Disclose Their Sources.*

Plaintiff seeks to have the Court order defendants Tyler and Golden to reveal those individuals who were the sources for the stories in question. Because the Court has concluded that the motion is premature, it will be denied without prejudice to its renewal at an appropriate time in the future.

■ Defendants Tyler and Golden have met plaintiffs' inquiries about the sources for the articles in question by asserting the privilege protecting a news reporter's confidential sources from revelation in the course of civil discovery. The existence of that privilege has recently been reaffirmed in this circuit. *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981). At the same time, it is well established that the privilege is not absolute but qualified and may yield in appropriate circumstances. A three part test has emerged as the standard for determining when a civil litigant may pierce the shield of confidentiality surrounding a reporter's sources. A reporter may be required to disclose confidential sources in the face of a civil litigant's showing that (1) he has a nonfrivolous claim; (2) he has no reasonable alternative sources for the information he seeks; and (3) the information is sufficiently important to the presentation of his case to warrant its disclosure. *Zerilli v. Smith,* at 713–714.

■ When the question arises in a libel action "and successful assertion of the privilege will effectively shield [the defendants] from liability, the equities weigh somewhat more heavily in favor of disclosure." *Zerilli v. Smith,* at 714; *see Carey v. Hume,* 492 F.2d 631, 637 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). Nevertheless, the assertion of a nonfrivolous libel claim does not automatically warrant compelled disclosure of a reporter's sources over a claim of privilege. *Zerilli v. Smith,* at 714 (citing *Cervantes v.*

*Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973)).

The *Zerilli* court's citation to *Cervantes* in this context is instructive. In *Cervantes,* the mayor of St. Louis, Missouri, brought an action against the publishers of *Life* magazine seeking damages for the publication of an article linking him with organized crime activities. The plaintiff's motion to compel the disclosure of the *Life* reporter's sources was met with a motion for summary judgment. The basis for the summary judgment motion was that, even without reference to the undisclosed sources, the disclosed sources of the article sufficiently supported the factual assertions such that it could not possibly be shown that defendants had acted with the requisite malice to be liable under the stringent standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The district court denied the motion to compel and granted the motion for summary judgment. Affirming, the United States Court of Appeals for the Eighth Circuit observed:

> Where, as here, the published materials, objectively considered in light of all of the evidence, must be taken as having been published in good faith, without actual malice and on the basis of careful verification efforts, that is, they were published in good faith without regard to the identity of the news sources, there is no rule of law or policy considerations of which we are aware that counsels compulsory revelation of news sources.

464 F.2d at 995.

■ It is of course true, as plaintiffs are quick to point out, that this case stands in a different posture than *Cervantes* insofar as the defendants here have not made a motion for summary judgment. But there is a significant similarity between that case and this one which counsels, at least for the time being, borrowing from its reasoning.

without more is not actionable in tort. Plaintiffs' claim fails against Mrs. Graham not because there is no indication that she acted mali-

ciously but because there is no indication whatsoever that she acted at all.

In this case, as in *Cervantes*, the defamatory statements are supported both by on the record and off the record sources.[8]

In *Carey v. Hume, supra*, the United States Court of Appeals for this Circuit noted that:

> The courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum; and one way of doing so is to make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed.

492 F.2d at 639. While the particular factor referred to in the quoted excerpt from *Carey* was exhaustion of alternative sources (discussed *infra*), it is also apparent that making disclosure of sources the end point of discovery rather than its beginning serves the additional purpose of assuring a context in which the Court can meaningfully assess whether the identities of the sources are crucial, important, or even relevant to plaintiffs' case before issuing an order compelling their disclosure.

That point has not yet been reached in this litigation. Thus, should the Court ultimately determine on appropriate motion of one of the parties that plaintiff is not in fact a "public figure" within the meaning of *New York Times Co. v. Sullivan* and its progeny, the identities of the sources will be of less, if any, significance to the presentation of plaintiffs' case and the balance might well tip against their disclosure. Furthermore, should defendants, like the defendants in *Cervantes*, at some point choose to rely solely upon on the record sources, there would be no apparent need to impinge upon their qualified first amendment privilege.

While the Court would not find that defendants could fight off these inquiries with the promise of further developments to come if this case were perilously close to trial, the fact is that a trial date has not yet been set in this case. Thus, it is apparent that forestalling plaintiffs' access to these sources will not significantly impair plaintiffs' case particularly where so many potentially fertile areas of discovery remain unexplored.[9]

Finally, it does not appear that plaintiffs have yet exhausted alternative sources for this information. It is true that plaintiffs' failure in this regard has been brought about in part by the resistance of certain individuals to discovery requests. *See* parts D, F & G, *infra*. Nevertheless, the present resolution of these matters will allow the plaintiffs to pursue these alternative sources so that if and when they renew the present motion the Court may consider whether the prerequisites for compelling disclosure have been met.

Accordingly, the plaintiffs' motion to compel will be denied without prejudice.

### D. *Congressional Deponent's Motion to Quash.*

On February 19, 1981, plaintiffs served subpoenas on Michael Barrett, Jr. and David R. Schooler, counsel, and Peter Stockton, investigator, to the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce (the Congressional deponents). This subpoena seeks to discover the source of several documents which found their way into the hands of defendants Tyler and Golden and ultimately into the stories here in question. The documents, a letter from Representative Dingell to Harold Williams, chairman of the Securities and Exchange Commission, and two memoranda which

---

8.  Thus this case is significantly dissimilar to *Carey v. Hume* where the only cited source for the defamatory statement was an undisclosed informant. 492 F.2d at 638.

9.  The Court's holding in this respect does not diverge in principle from the relief requested by plaintiffs; that is, an order that the defendants divulge the off the record sources of this information or be precluded from claiming the exist-

ence of those sources. *See DeRoburt v. Gannett Co., Inc.*, 507 F.Supp. 880, at 887 (D.Hawaii, 1981). If at some appropriate time in the future it appears that the identity of these sources actually proves critical to plaintiffs' case and alternative sources have failed to disclose them, the Court will order their disclosure.

were prepared by Stockton and Schooler, two of the present deponents, convey suspicions of possible wrongdoing by the present plaintiffs. The Congressional deponents, urging that the subpoenas be quashed, argue that they are absolutely protected from any inquiry by the speech or debate clause of the United States Constitution, Art. I, § 6, cl. 1.

■ It is beyond dispute that the speech or debate clause confers on legislators immunity from judicial process requiring them to answer questions relating to the performance of their legislative duties. The privilege applies with equal force to the activities of congressional staff. *Gravel v. United States*, 408 U.S. 606, 616, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972). Once it is established that conduct falls within the parameters of that privilege, the protection is absolute and further inquiry is at an end. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975). While the clause's protection is limited by its terms to speeches and debates, the protection is construed broadly to reach any activities that can be characterized as within the "regular course of the legislative process." *United States v. Brewster*, 408 U.S. 501, 525, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972).

■ Among those activities that have been held to be within the protected legislative sphere are congressional efforts at gathering information for use in the legislative process. *Eastland v. United States Servicemen's Fund*, 421 U.S. at 504, 95 S.Ct. at 1821; *Doe v. McMillan*, 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973); *McSurely v. McClellan*, 521 F.2d 1024, 1036 (D.C.Cir.1975), *aff'd en banc by an equally divided court*, 553 F.2d 1277 (1976), *cert. dismissed*, 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978). But while efforts directed at gathering information are, within limits, constitutionally immune from in-

quiry, a consistent line of authority holds that the act of disseminating information outside of Congress is beyond the legitimate legislative sphere and therefore outside of the protections afforded by the speech or debate clause. *See, e.g., Doe v. McMillan*, 412 U.S. at 317, 93 S.Ct. at 2027; *Gravel v. United States*, 408 U.S. at 625, 92 S.Ct. at 2627; *McSurely v. McClellan*, 521 F.2d at 1039. It is clear, therefore, to *the extent that plaintiffs seek testimony from the Congressional deponents relating to the dissemination of the so-called Dingell* documents, and for that matter any other information, to the *Post* reporters, the subpoenas do not impinge upon the legislative privilege and the motion will be denied.[10]

Having determined what matters do not fall within the privilege, it is necessary to turn attention to those matters that will fall within the privilege. As previously noted, investigations by congressional aides for the purpose of gathering information on a subject which appears on its face to be of legitimate legislative interest are protected by the privilege. Although plaintiffs have repeatedly suggested that the subject investigation was not actually aimed at uncovering information of valid legislative interest but rather was undertaken, at the urging of the *Post* defendants, as a means of lending legitimacy to the stories in question, it is clear that such assertions, even if true, do not pierce the legislative privilege.

> Thus, it matters not that the true purpose behind a committee's use of its investigative power is to ridicule, harass, or punish a private citizen. So long as the particular investigative activity does not trench upon Executive or judicial prerogatives— so long as it remains facially legislative in character—the committee, and its employees, are protected.

*McSurely v. McClellan*, 521 F.2d at 1038. Thus, inquiry into what motivated the Con-

---

**10.** The Court rejects the argument, urged by these deponents, that the plaintiffs have failed to make a sufficient showing that these individuals participated in or have knowledge of the dissemination of this information to the *Post* reporters. The undisputed fact that these documents were in the possession of the defendants is a sufficient showing that these individuals might at least have knowledge of who was responsible for the dissemination. There are other indications in the record to support this inference.

gressional deponents to investigate these matters is not a permissible subject of examination.

The Court finds similarly unavailing plaintiffs' arguments that an informal investigation is not subject to speech or debate protection.

> [I]t would appear impossible to subpoena materials relating to an investigation without first obtaining enough information to know to whom, where, and for what the subpoena should be directed. The gathering of such information, whether in preparation for a subpoena, an investigatory hearing, or a legislative report seems an integral part of Congress' investigative function and entitled to the same protection as the use of that information within Congress.

*McSurely v. McClellan*, 521 F.2d at 1037.

A far more subtle question is presented, however, relating to the conduct of third parties in relation to a congressional investigation. Specifically, as applicable to this case, the question presented is whether and to what extent plaintiffs may inquire into communications by the *Post* reporters, either directly or indirectly, to the congressional staff. The extent to which third party communications are protected from inquiry by the speech or debate clause is open to some question. In *Gravel, supra,* the Court held that:

> Rodberg's immunity, testimonial or otherwise, extends only to legislative acts as to which the Senator himself would be immune. The grand jury, therefore, if relevant to its investigation into possible violations of the criminal law, and absent Fifth Amendment objections, may require from Rodberg answers to questions relating to his or the Senator's arrangements, if any, with respect to republication or with respect to third-party con-

duct under valid investigation by the grand jury, *as long as the questions do not implicate legislative action of the Senator.*

408 U.S. at 628, 92 S.Ct. at 2628. The Court feels a similar scope of inquiry is permissible here.[11] Thus, while inquiry into the motivation behind the Congressional deponents' investigation is foreclosed by the speech or debate privilege, *inquiry into the apparent motivation of the Post reporters in bringing the matter to the staff's attention, if in fact they did, would not be similarly precluded.* Furthermore, *insofar as these possible contacts could be construed as a solicitation for the dissemination of information by congressional staff, they cannot be said to implicate valid legislative activities since, as previously noted, dissemination does not fall within that characterization.*

Accordingly, the Congressional deponents' motion to quash the subpoenas served on Barrett, Schooler and Stockton will be denied. The conduct of those depositions should, however, be governed by the views expressed in this memorandum.

### E. *Defendants' Motion to Compel.*

On December 15, 1980, the *Post* defendants served on plaintiffs interrogatories and requests for production of documents. On February 19, 1981, plaintiffs responded to these by supplying information and documents and also interposing a number of general and specific objections. It is these objections which are at issue in the present motion to compel. On the basis of the present record the Court has concluded, for the reasons that follow, that the defendants' motion should, for the most part, be granted.

---

11. It is of course true that *Gravel* differs from this case insofar as the question there pertained to possible violations of the criminal law. The Court does not, however, find that to be a significant distinction for purposes of this motion. The speech or debate privilege is absolute and not subject to a balancing of interests. Thus, the quoted excerpt from *Gravel* cannot be read as stating that the privilege had, in that case, been overridden by a paramount interest in enforcement of the criminal law but rather must be read to state, as its language suggests, that the particular matter into which inquiry was permitted fell outside of the privilege.

1. *General Objections.*

(i) *Definitions of Mobil, Samarco
and Atlas.*

■ The initial objection raised by this motion involves the definition used to limit the terms, Mobil, Samarco and Atlas as used in the interrogatories and request for production of documents. The Court feels that this matter might well have been amicably resolved between the parties.

In any event, it is quite clear that the allegedly defamatory statements here in question involve fairly complex business dealings undertaken by and through a large number of entities. The structures of the corporations and partnerships which were the principal actors in these transactions are relevant to this litigation. Likewise, transactions or communications carried out through subsidiary or affiliated entities are relevant. This information is within the knowledge of or accessible to the plaintiffs. Accordingly, plaintiffs should respond to the requests based on the definitions of Mobil, Samarco and Atlas as modified by defendants' letter of February 19 attached as Exhibit E to defendants' motion to compel. Should these definitions still prove unreasonable or produce an absurd result, the parties shall meet for purposes of resolving the problem amicably or at least narrowing their dispute to reasonable proportions before seeking further intervention from the Court.

(ii) *Possession, Custody or Control.*

■ As it initially arose, the question of what documents plaintiffs could be required to produce involved both Peter Tavoulareas' access to Atlas documents and William Tavoulareas' access to Mobil documents. Since that time, defendants have elected to seek Mobil documents directly from Mobil.[12] The question remains to what extent Peter Tavoulareas should be required to produce documents belonging to Atlas Maritime Company and other related entities.

In objecting to the request as written, plaintiff Peter Tavoulareas stated:

Plaintiff objects to defendants' attempt to obtain documents through him which are not in his possession, custody or control but are in the possession, custody or control of persons who are not parties to this action. Plaintiff's references hereafter to documents which are within his possession, custody, or control are limited to those documents which are within his *personal* possession, custody or control.

Response by Plaintiff Peter Tavoulareas to Defendants' First Request for Production of Documents at 2 (emphasis supplied). When viewed in the light of the terminology of the request, which required that Peter Tavoulareas produce documents that he "or any of his attorneys, agents, or representatives has the legal right to obtain, or has the ability to obtain from sources under his control," the objection is a clear misstatement of the law as it has developed under Rule 34.

The rule clearly requires a party to produce documents which are in his personal control or which he has a legal right to control or obtain. *See* C. Wright, Law of Federal Courts 431 (3d ed. 1976). Thus insofar as Peter Tavoulareas suggests that he will only produce such documents as are within his *personal* control, he clearly fails to provide an adequate response to defendants' request.

In resisting the present motion, plaintiffs have sought to remedy the inadequacy of that initial response by conceding that the question is one of constructive as well as actual control but arguing that plaintiff Peter Tavoulareas has neither with respect to Atlas documents.

This claim is a little disingenuous in light of the admitted fact that Peter Tavoulareas brought Atlas documents to the United States "to discuss with [his] father and [his] counsel the possibility of bringing suit against Mr. Comnas." Affidavit of Peter Tavoulareas at ¶ 5. Thus, it is not quite clear why Peter Tavoulareas, who owns 50%

12. This request is now the subject of a motion to compel which has been fully briefed, but not yet argued.

of Atlas Maritime, can no longer have access to these documents when they are requested by defendants. Nor is there any indication of what efforts, if any, Peter Tavoulareas has made to use whatever control or influence he has over the affairs of Atlas Maritime to acquire documents for purposes of responding to this discovery request.

The Court will order that Peter Tavoulareas, within thirty days of the entry of this order, produce the requested documents to defendants or show in detail that he has made a good faith effort to do so and that that effort has been unavailing.[13]

### (iii) *Knowledge of Agents and Representatives.*

Plaintiffs have also objected to defendants' instruction for answering interrogatories, which states "[w]here knowledge or information is requested, such request includes knowledge of or information possessed by the party's agents, representatives and, unless privileged, his attorneys." It is quite clear that defendants' instruction appropriately states the requirements of Rule 33 and should be complied with. *See Olmert v. Nelson*, 60 F.R.D. 369, 370 (D.D.C. 1973); C. Wright, Law of Federal Courts at 427; 4A Moore's Federal Practice ¶ 33.26. It may be that as to specific interrogatories the instruction would render the question unduly burdensome or otherwise inappropriate but on the basis of the present record the Court cannot make any further refined ruling than that specified above.

### (iv) *Use of the Term Affiliates.*

Plaintiffs object to the use of the term "affiliates" in certain requests as being ambiguous. It would appear that the term has a generally understood meaning in the business community and questions employing the term should be answered in accordance with that meaning. If the plaintiffs still feel the term is ambiguous, they should resolve the ambiguity through discussions with opposing counsel and not resort to the Court.

### 2. *Specific Objections.*

#### (a) *Relevance.*

The vast majority of plaintiffs' objections to defendants' specific discovery requests are based on the claim that those requests seek information which is not relevant to the issues in this litigation. In addressing these issues, it is necessary to bear in mind that the standard of relevance as a limitation on discoverability is distinct from the standard of relevance which governs the admissibility of evidence at trial. *Smith v. Schlesinger*, 513 F.2d 462, 473 (D.C.Cir. 1975); *Freeman v. Seligson*, 405 F.2d 1326, 1335 (D.C.Cir.1968). Professor Wright states the rule of relevance governing discovery as follows:

> Discovery cannot be limited to evidence that would be relevant at the trial. The concept at the discovery stage is much broader, as was made specific by a 1946 amendment to Rule 26(b), stating that it is not ground of objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence. Certainly the requirement of relevancy should be construed liberally and with common sense, rather than in terms of narrow legalisms. Indeed it is not too strong to say that discovery should be considered relevant where there is any possibility that the information sought may be relevant to the subject matter of the action.

C. Wright, Law of Federal Courts at 403 (footnotes omitted). The rule has been stated by the Court of Appeals in this Circuit as providing for discovery of information if it "will have some probable effect on the organization and presentation of the moving party's case." *Smith v. Schlesinger*, 513 F.2d at 473.

Applying this rather liberal standard to the issues in this case, the Court has reached the following conclusions.

---

13. The Court is not unaware of the explanation offered by plaintiffs for the present inability of Peter Tavoulareas to produce Atlas company documents. What the Court has ordered, however, is that Peter Tavoulareas make a good faith effort through means reasonably at his disposal to secure and produce those documents.

### (i) *Information Pertaining to Salary and Income.*

■ The defendants have requested documents pertaining to the salary and income of both plaintiffs. Given the fact that the complaint seeks damages for, among other things, loss of business reputation, the Court finds that this information is sufficiently relevant to require its production notwithstanding plaintiffs' arguments that they have not placed these matters directly in issue because they have not yet claimed any specific loss of income. It is sufficient to say that loss of business reputation might well be expected to be attended by loss of income. The absence of any loss of income might be used to cast doubt on the claim of loss of reputation or as probative of its extent. Furthermore, this information might reasonably be expected to bear on the issue of the truth or falsity of the defamatory statements since in part those statements suggest that company assets and business have been diverted to personal uses. In any event, it is clear that information pertaining to the salary and income of plaintiffs is sufficiently relevant to be discoverable.

### (ii) *Information About Peter Tavoulareas' School and Employment History.*

■ It seems logical to assume that an individual's reputation will be dictated, at least in part, by his experience both academic and in the workplace. Likewise, an individual's qualifications for a job are largely established through his prior work and academic history. Since both the reputation and qualifications of Peter Tavoulareas are at issue in this case, the requested information is at least relevant for purposes of discovery and should be produced.

### (iii) *Use of Mobil Aircraft.*

■ Defendants are seeking certain information pertaining to the use of Mobil company aircraft by plaintiffs. Defendants argue that the information is relevant insofar as it might supply evidence of personal use of company assets. As such misuse would be relevant to the question of plaintiffs' reputations, it would appear relevant to at least one of the issues in this litigation. It is important to note that defendants have a basis for making this request in light of the deposition testimony of Philip Piro, William Tavoulareas' former son-in-law, that Tavoulareas used company aircraft for personal purposes. It will be ordered produced.

### (iv) *Payment of Attorney's Fees.*

■ The question of who is bearing the legal expenses involved in this litigation, despite defendants' offered justifications, does not appear sufficiently relevant or calculated to lead to relevant information to be discoverable. Accordingly, defendants' motion as to that information will be denied.

### (b) *Attorney Work-Product.*

On the basis of the present record, the Court is unable to assess the validity of plaintiffs' assertion that certain information is not discoverable because it is attorney work-product. The parties are instructed to meet to discuss the question of attorney work-product with a view toward resolving the matter amicably or at least narrowing the areas of dispute.

### (c) *Remaining Issues.*

A less than lucid presentation of the issues remaining in dispute combined with the ongoing supplementation of responses to certain requests has made it all but impossible to discern precisely what issues still remain in dispute. This difficulty has apparently arisen in part as a result of the failure of counsel to meet and discuss the issues with a view toward narrowing the areas of dispute. The Court has made every effort to address all of the remaining issues. The Court is, however, aware of the possibility that issues may have escaped attention. The parties may bring those issues to the Court's attention but they are encouraged to first attempt to resolve the issues by reference to the general views set forth in this memorandum.

It may also be that information which the Court has deemed relevant and discoverable should be subject to some form of protective order. Again the parties are encouraged to seek agreement on the necessity and form of any such relief prior to invoking a ruling from the Court.

### F. *George Comnas' Motion to Quash.*

■ The plaintiffs are seeking the deposition testimony of George Comnas. Comnas has made a motion to quash the subpoena insofar as it seeks testimony and documents which Comnas submitted to the Securities and Exchange Commission. The primary basis of the motion is that the information pertains to an ongoing nonpublic investigation by the SEC. Comnas seeks an order that the documents not be subject to discovery prior to the conclusion of the SEC proceedings.

On August 4, 1981, plaintiffs submitted to the Court a letter from John Fedders, Director of the Division of Enforcement of the SEC. In his letter Mr. Fedders states:

> The Commission has conducted a private investigation into possible violations of the securities laws by Mobil Corporation, William Tavoulareas and others. This investigation related generally to allegations that certain filings with the Commission of Mobil were incorrect concerning the influence of Mobil's President, William Tavoulareas, and other senior Mobil executives in establishing William Tavoulareas' son, Peter Tavoulareas, in a business related to a company in which Mobil had a minority interest. Based on facts set forth in the staff's report of investigation, the Commission has concluded no enforcement actions against Mobil Corporation or William Tavoulareas are warranted, and the investigation has been terminated.

As this eliminates the sole basis of Comnas' motion, the motion will be denied.[14]

---

**14.** Comnas also argues that his SEC testimony is not relevant to matters at issue in the *Post* litigation. Given the liberal standard of relevance applicable to discovery, *see* part E2(a), *supra*, the Court feels that what Comnas told the SEC is sufficiently relevant to the question

### G. *Congressional Deponents' Motion for a Protective Order with Respect to the Deposition of Comnas.*[15]

■ The Congressional deponents seek a protective order limiting plaintiffs' inquiry during the deposition of George Comnas from impinging on the speech or debate privilege. The plaintiffs oppose this motion on two bases: "(1) plaintiffs do not seek discovery of Mr. Comnas into a legislative act because [no legislative act] occurred, and (2) the Congressional Aides' unwarranted extension of legislative privilege to a non-congressional source contravenes established legal principles." Plaintiffs' Memorandum in Opposition to Congressional Deponents' Motion for a Stay or Alternatively for a Protective Order at 4.

The first of these contentions has been disposed of in part D, *supra*, where the Court concluded that *the privilege did apply to the matters here in question and roughly outlined its scope.*

Turning now to the second contention, *the Court has concluded that plaintiffs' view that the speech or debate clause does not extend to questioning of a third party other than a legislator or his aides is simply a misstatement of the law.*

In *Gravel v. United States, supra,* the Supreme Court concluded:

> Because the Speech or Debate Clause privilege applies both to Senator and aide, it appears to us that paragraph one of the order, alone, would afford ample protection for the privilege if it *forbade questioning any witness, including Rodberg*: . . . concerning the motives and purposes behind the Senator's conduct or that of his aides . . . .

408 U.S. at 628–29, 92 S.Ct. at 2628–29 (emphasis added). In proceedings below, the United States Court of Appeals for the

---

of what Comnas told the *Post* reporters to require its production.

**15.** As previously noted, the Court has granted the Congressional deponents leave to intervene for the limited purpose of making this motion.

First Circuit had stated, "*United States v. Johnson* [383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)] holds that any person who dealt with a legislator with respect to speech or debate cannot be inquired of if the object is to attack the legislator's motives in speaking." *United States v. Doe,* 455 F.2d 753, 761 (1st Cir. 1972).

The holding of *Johnson* has recently been characterized by the Supreme Court as follows:

> A similar inference is appropriate from *Johnson* where we held that *the Clause was violated by questions about motive addressed to others than Johnson himself.* That holding would have been unnecessary if the Clause did not afford protection beyond legislative acts themselves.

*United States v. Helstoski,* 442 U.S. 477, 489, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12 (1979).

> *The inescapable conclusion to be drawn from those holdings is that the speech or debate clause prohibits the use of judicial process to inquire of a third party about the legislative acts of a legislator or his aides.*[16] But as has been indicated in part D, *supra,* the protection of the clause as applicable in this case has certain limitations. The Comnas deposition should proceed in a manner consistent with the permissible scope of examination as set forth previously with respect to the Congressional deponents.

## III.  CONCLUSIONS.

For the reasons stated in this memorandum, the Court has concluded that (1) the *Post* defendants' motion under Fed.R.Civ.P. 39 for a jury trial should be granted; (2) defendant Graham's motion for summary judgment should be granted; (3) the plaintiffs' motion to compel the *Post* defendants to reveal their sources should be denied without prejudice;  (4) the Congressional deponents' motion to quash should be denied but the depositions of Congressional

deponents shall be governed by the views set forth in part D, *supra*; (5) the defendants' motion to compel production of documents and answers to interrogatories should, for the most part, be granted; (6) Comnas' motion to quash should be denied; and (7) Congressional deponents' motion for a protective order with respect to the Comnas deposition should be granted to the extent stated in part G, *supra.*

---

**16.** As noted in part D, *supra*, the Court does not find a significant distinction in the fact that this is a civil case as opposed to the cited cases, which involved criminal matters. Nevertheless, the conclusion of those cases that third parties could not be required to testify in service of the paramount interest in enforcement of the criminal law would seem to apply with greater force here.